We're departing from our list because of the failure of the seaplane to make it. So that counsel who's here can understand what's going on. I just want to give you notice that after this argument, I'm going to ask Mr. Chancellor to come up. You can come up too. It's about another matter completely that we need your advice about. We need to know for tomorrow's case. Okay, we will now hear counsel United States v. Weekes, number 062082. Good morning, Your Honors. Good morning. May it please the Court. You weren't here when I said how happy we were to be in the Virgin Islands, so I'll tell those people who came in late that we are happy to be in St. Louis. May it please the Court. My name is Eric Chancellor and I'm here to argue on behalf of the appellant, Denise Weekes, in this case. Your Honor, the issues that we briefed in this case is based upon improper comments that were made by the prosecutor. Are we on a tape or are we on a disc? Okay, so the disc can hear you. Let me say first I'd like to reserve three minutes. That's granted. The issues briefed on appeal is that the prosecutor made improper statements during his closing, which amounted to improper vouching for the witnesses. Can you define vouching for us? Well, that law is well developed in this circuit. Okay. And according to the cases that I read, vouching constitutes an assurance by the prosecutor of the credibility of a witness through personal knowledge or by other information outside of the testimony presented to the jury. And doesn't it suggest that the prosecutor has information that has not yet been placed, has other information from other sources? That's correct, Your Honor. And in fact, this Court has stated that there are two criteria that must be met. One, the prosecutor must assure the jury that the testimony of the witness is credible. And secondly, the assurance is based upon either the prosecutor's personal knowledge or other information not contained in the record. And we believe that we have exactly that here. The first statement, of course, made by the prosecutor in this case was that the prosecutor gave a guarantee, his personal stamp of approval, that a witness who testified and who testified she did not see could not recognize the defendant, but who only saw she saw an individual behind a building and that that individual had a bag in his hand. Let me ask you something. Didn't the District Court sustain all the objections to the closing argument? That's correct. Well, how will you have an unfair trial then? Because, Your Honor, it was already put before the jury. And there were no limiting instructions given to the jury. Did you answer them? I don't believe that they were asked for, Your Honor, from the record. The court gave a standard set of instructions which instructed that the jury is not to consider the arguments of the counsel. You said they're not evidence, right? That's correct. And those are the standard. But this court has consistently held that the remedial instructions must specifically address the issues that were raised as a result of the vouching. And there were none given in this case. If you didn't ask for a specific instruction to that extent, then what is our standard of review? Well, we objected, Your Honor, and we believe that the standard of review would be harmless error. Or, yes, harmless error review. Wouldn't it be—is there an argument to be made that it would be plain error if you didn't ask for an instruction that encompassed that which you're arguing for now? Not that you've weighed it completely, but that it would be a different standard of review? I don't believe so. I think, Your Honor, it's sufficient that the objection was made at that time. Do I guarantee you? Well, there was no objection. There was no objection. Did I guarantee you? That's true. That's what we were focusing on. That is true. And in that particular instance, if you took that particular statement in isolation, we do have to use a plain error analysis. Okay. That's what I'm asking you. Okay. Yes. Yes, Your Honor. Certainly, and I agree with that. However, we can't just take that particular statement in isolation also. We also have to take it along with the other statements that were made and were objected to. And our position is that taking all of those together, that we have a vouching that rose to the level of constitutional proportions. Okay. Why don't you tell us what the others were so that you can set your argument out? During the trial, Agent Decimo stated that he accused Weeks of committing this crime just two days after the incident. Now, Weeks' counsel, of course, argued that, well, he did that accusation without even talking to the plaintiff, to the victim, without even completing an investigation. The prosecutor stated that, well, why did he do it? Because he must have gotten the information from someone else. Well, government says that these people, well, there was testimony, that these people gave testimony before the grand jury and that that was not objected to. Isn't that right? Well, there was some testimony from Agent Decimo that there was a grand jury and there was testimony before a grand jury. From these same people. No, not from these same people, though. Not from these same people. This was separate from that statement. And this was just two days after the incident. And he goes on and continually says, well, how does he know? How does he know unless he got that information from somebody else? That, Your Honor, is stating that there is other people out there or someone else out there who gave this information. That person was not present at trial, and the prosecutor is saying, we have other evidence, but we couldn't present it. Now, an objection was sustained to that. And the objection was sustained. You're saying the review is harmless, though? We're saying that in that particular case, and we're following Molina-Guevara in that particular instance, is saying that this is a person, an identifiable person out there who they're contending would have testified consistently with Agent Decimo. And therefore, it rises to the level of constitutional proportion. And therefore, it can only be affirmed if the error is harmless beyond a reasonable doubt. All right. Now, wasn't there Mason Newweeks personally, right? This is correct. And a disinterested eyewitness identified him. And this was, I mean, there were people that knew him that identified him, right? There were two people, two witnesses in this case, who identified him. So wasn't the evidence pretty strong? Well, the proof is in the pudding, Your Honor. This is the second trial. The same evidence was presented on the first trial. Stranger things have happened. But, I mean, nevertheless, I mean, in terms of harmless error, you never know why a jury does something. But you had pretty strong evidence here. Well, no, Your Honor, because if you look at what those witnesses testified to, first of all, Mr. Mason, as counsel argued, was on crack. He was a crack addict. He admitted that. And that morning, he was in desperate need for crack. And I believe that the judge even instructed, gave the instruction, that you have to treat the testimony of these people differently. Right. Okay? Correctly. Secondly, with regard to that other witness, he testified before the grand jury, and that was brought out in the trial, that he didn't see anything. And then he came back and changed his testimony. But there was evidence here of fear of the group, that retaliation. That's just it. And there we go. There's another statement that was objected to. The prosecutor said that there's a code of silence, and that's why he said it. There was no evidence of a code of silence. And, again, it's suggesting that there are other people out there who just told me to come in. Didn't the defendant here say something to the detective about his group? I'm trying to remember what it was. They won't talk or something like that? I think he must have said, you're going to have to prove that when he was accused. No, I think a little beyond that. Didn't he say something about none of my group will talk or something to that effect? I don't believe he said that. You're going to have to prove that, but none of my people. I think it was to the effect, and you can correct me if you can find it that, you're going to have to prove that. And then he goes on with, of course, the code of silence, that there's a code of silence and you don't become a witness, which, again, implies that there are other witnesses out there just too scared. Here it is. You will have to prove that because nobody is going to talk about that in my neighborhood. Isn't that what he said? Excuse me. No, no, go ahead. Isn't that what he said to the detective? Is that what he said? Fully admissible evidence and admission of a defendant in a case. Well, I don't think that's admission to say, hey, nobody's going to talk about that. It's a statement by a defendant that you come in here. True. It's a statement by a defendant. I don't think it rises to the level of saying that allows the prosecutor to say there's a code of silence. He's saying, you're going to have to prove that. Who's going to say that? Who's going to say that I did it? I didn't do it. You could argue the other way. There are a few other improper remarks. One was the remark that if you believe that we should have to show a gun or prove there is a gun, can you imagine what this place would be like? You think we have crime now? That, Your Honor, was inflammatory to the jury, and it was wholly improper by the prosecutor. Now, the government says that's an invited response, but there's nothing that invited this response. There was no attack on the prosecution himself that would merit an invited response. So that was wholly improper. He should have stopped where he said that was a red herring. That issue about there's no gun is a red herring. What is the effect when a trial judge sustains an objection? There was only one statement about which you complained, that the trial judge didn't sustain the objection because there was none. But the trial judge sustained your objection. What is the effect of sustaining an objection and telling the jury that what the counsel say is not evidence on your constitutional argument? Well, I think it goes to—well, that's a good question. Thank you. I can't slow score. Well, that's true, and I think that remedial instructions would be warranted in that case. And didn't he give remedial instructions? Well, he did not give remedial instructions. It wasn't asked to. It wasn't asked to. That's true. He said defense counsel talks too much, has talked too much. That was as far as he went. Yes, he did say he talked too much. I think we all think so. I can speak only for myself, but I think we all do. You know, I think viewed in isolation, one or two of these comments you can say may have been harmless. But with the totality of the circumstances, and I think the court takes that into consideration based upon what I've read in the court's prior decisions, the whole—all of these statements as a whole taken together shows that the trial is unfair. And again, I understand what you said, Your Honor. However, the first trial ended in weeks being acquitted of one charge and hung jury on the others. Thank you. We'll hear from you on rebuttal. May I please the court? My name is Kim Chisholm, and I'm an assistant United States attorney, and I am representing the appellee, the United States, in this case. Your Honor— Let me interrupt you before you get started because I'm troubled. As your friend across the way has said, one way to view this record is that there was a— the prosecutor had laid down a consistent pattern of suggesting to the jury that there were witnesses who had not been heard but would be incriminating if they were there. And at least three—I mean, the first, of course, Regis testified that she saw a person with a bag, but she was unable to identify who the person was or what was in the bag. And on closing, the prosecutor said she just saw the person come out and walk down. She also said the person had a bag in her hands. Remember, I asked her what the person—what did the person have in his hands walking down. I guarantee you that the murder weapon—of course, it wasn't a murder case, but I guarantee you that the murder weapon that this defendant was on his way to dispose of was in this bag. Now, nobody had identified this person or what was in the bag, so if he was guaranteeing something, it must be on the basis of some testimony that the jury had not heard. Then he goes right on and he says, why did—I don't know how to pronounce this fellow's name. Deshormieu? Is that his name? Deshormieu. Why is Deshormieu telling Weeks, I know you did it? Why is he telling him as opposed to anybody else in the community? Unless Deshormieu got information from someplace else. Objection. Arguing facts not in evidence, Your Honor. Sustained. And then he goes on to say that there were—remind the jury that there were associates of the defendants who went to the grand jury to testify in support of the indictment and they hadn't heard any such witnesses. And again, Your Honor, arguing facts not in evidence, sustained. Isn't that a pattern? Didn't the prosecutor consistently try to get across to the jury that you don't just have to rely on what we've given you here because there are all these other witnesses who would say he did it? Judge, I say no. And the reason I say no is because with respect to the I guarantee comment made by the prosecutor, I think the evidence during the trial was that the defendant, Phineas Weeks, was actually the shooter. There was testimony from an eyewitness who testified that he saw Weeks shoot Mason. And there was testimony by various individuals, including, I believe it's Ms. Regis, who saw the defendant shortly after the incident or saw a person shortly after the incident coming from behind Building 9 and 10 carrying a brown paper bag. And I think there was also testimony of a neighbor of the defendant's mother, which was also Building 10 where the defendant lived, that testified that she heard the shot and saw the defendant when she went to close her porch door, saw the defendant entering Building 10. So there were a number of witnesses that placed the defendant, Weeks, on the scene of the incident besides Gary Mason who said that he shot me. I'm not sure I understand how this is responsive to my question. Are you arguing that it's harmless error that all these other witnesses were invoked? No, I'm arguing, Your Honor, that the guarantee, I think the wording was very strong, but I think if you look at the statement and the context in which it was given that the prosecutor was arguing to the jury that they could infer inferences based on the evidence. And I think that what the prosecutor was saying, if you look at the entire text of that portion of the argument, was that you can draw a reasonable inference, and that reasonable inference is that Weeks was the individual carrying. Wait a minute. You're saying that there was evidence in this record from which somebody could guarantee that that was Weeks and that what was in that bag was the murder weapon. I think that there was sufficient evidence from which a jury could infer, yes, Your Honor, because there was a shooting and we know that there was a gun involved. There was a bullet fragment found inside of the white pickup truck. We know that there was a shooting. We know that there was a gun. Yeah, we know about that. We don't know that this was the defendant going to dispose of the weapon and that he had the weapon in the bag. But it's a reasonable inference that a jury could draw, Your Honor. The woman said that she didn't see when she was asked whether she saw the face. She said no, but I think given the circumstances, the location of the individual with the brown paper bag in close proximity. Let's go on to the next one. Before we leave that one, isn't there a difference between reasonable inference and guarantee? I just want to say that. And that's why I say the word guarantee is strong. And if you take the case cited by... Strong, wrong. Well, it was inartfully framed, I would suggest, Your Honor, because I think in the Disposo case that's cited by the appellant, the word guarantee is where the prosecutor is speaking clearly from his personal knowledge where he's saying, in that case, I guarantee you that this defendant pled guilty to two separate offenses. That's from his personal knowledge. But here, the prosecutor wasn't on the scene. This isn't a guarantee such as that stated in Disposo. It's more of an inartfully framed because right after the prosecutor says, I guarantee that that was the murder weapon in that bag, he then goes on to say, again, logical inference. That's a logical inference. And I can point the court to the records that I'm referring to there if the court wishes me to, but he does go on to expound upon that being what he's gleaned from the evidence. I'm sorry, I interrupted Judge Stabenow. Let's go on to the next one where he says, look, this detective accused him of doing it at a time when he had not talked to the witness. So he must have had other witnesses that talked to him. I think, Your Honor, again, there's a couple of bases by which I think the prosecutor's statement was not improper in that context, because in the context of this trial, because if we know the facts of this case, this murder occurred, or this shooting, I'm sorry, the shooting occurred on August 30th of 1999, and the victim was hospitalized and had been hospitalized for at least two weeks prior to the time that Detective Disselmore went to see him. But we also know that two days after the shooting, September 1st, the detective went to Weeks and confronted him and accused him. And so he had to have had information from some, it wasn't developed at trial, from whom the information came. That's the problem. How can you do that? That's the problem. He's got a constitutional right to confront people that are accusing him of a crime. And here they're saying to the jury, look, there are other people who saw him do this, but they're not here, but they wouldn't say this if they were here. Right. But, Judge, that testimony came in without objection, and whether the challenge to that testimony would have come as a Fourth Amendment challenge, I think, and not in terms of, in the context of whether it's improper prosecutorial statements. The fact of Disselmore confronting the defendant without perhaps having, at that time, probable cause or reasonable suspicion is not before us today, but the question is whether or not, you know, having done it, counsel did not object to that testimony coming in. Counsel did object. To that testimony? Defense counsel objection, arguing facts, not an evidence, Your Honor. I'm sorry, Your Honors. That was during the closing. That wasn't during when the testimony was elicited during the trial, that this had, in fact, occurred. And I can point the court to that record where. I'm sorry. You're right. Yes. So during the trial. I'm not sure that helps, but. Well, I think it does, Your Honor, because this is based on then the prosecutor's statements then become statements that are based on what the evidence was for what it's worth. The evidence being that witnesses testified in the grand jury. That's on page 55 of the appendix. There was no objection to this testimony, that witnesses did testify. You said they're different witnesses when I asked the felon's counsel. Is that correct? I don't think it was clear, but I know that it was clear, Your Honor, that associates of the defendant testified, and there was no objection to the terminology of those individuals as being associates, and that's on page 56 of the appendix. And that these individuals testified on two occasions, and there was no objection to that, so that's on page 56 of the appendix. And those two occasions were December 7th of 1999 and December 14th of 1999. And then we have, without objection, testimony that the defendant left St. Croix on December 10th. So the defendant associates testified before the grand jury on December 7th, and three days later the defendant flees the jurisdiction, which was the unobjected to evidence at trial. So I think that a reasonable inference can be drawn that the defendant fled  during the trial, was not objected to by defense counsel. So counsel was arguing what had come out and asking the jury then, at that point, based on what the evidence was. This was by way of explanation of this flight. Well, I think that what the argument that's alleged to be improper is the fact that other witnesses would come in. Yeah, but if I understand what you just said, this helped to explain why he fled? Well, also, the basis upon which the prosecutor stated that, you know, there was more. But if I might, Your Honor, the context in which these statements were made, I don't think that the explanation that the counsel was trying to explain the flight. I think that what he was trying to, that what the flight does, though, is that it explains the evidence that he's arguing, which is that this defendant, that there are other witnesses who that decimal might have received information from other witnesses, and that this is based upon the record in the case. This isn't based upon asking them to speculate as to what the witnesses would state, because the evidence was that there were witnesses who went into the grand jury, and that subsequent to the first set going in, the defendant fled. Therefore, the jury could infer that, you know, something was stated in the grand jury that was not favorable, such that the defendant said, I better get out of town. Help me a little bit. You suggested that the failure to object during the course of the trial cured the segments of the closing argument that we've talked about before, and that seems like somebody saying, well, Your Honor, that's not a problem because I did it twice rather than once. And there were objections to two of those comments during the prosecutor's closing, and defense counsel moved for a mistrial immediately following the closing arguments, contending that, quote, the government's argument was rife with the government arguing facts not in evidence. Yes, Your Honor. And in this case, there were many curative instructions given, and I'd like to take the remainder of my time, if I might, to go through them and explain that if there was error, that it's harmless error. And these were all given the day before this problem arose, right? These were all given subsequent to the charge. These were all given subsequent to closing, I believe. I thought the only thing that was after the closing, I mean, after these closings, was the statement that the defense counsel, well, the district court denied the motion for a retrial and admonished the prosecutor, quote, for talking too much. Your Honor, the transcript, and it's not contained in the appendix, but the transcript of the jury charge before the Honorable Chief Judge Raymond L. Finch was not included in the transcript. In the appendix. In the appendix, I'm sorry. It is a part of the transcript. And there are many, many instances during that where the judge charges the jury appropriately, and specifically with reference to the comment about the guns being wild on the streets of St. Croix, it's clear that this is post that statement, because when the jury instructions continued on April 7th, the judge said, ladies and gentlemen of the jury, I said to you earlier what punishment this defendant will receive is business for the court and is not your concern. The defendant is not on trial for any general charge concerning weapons. He is not on trial for anything not in the indictment. He cannot be held accountable for crimes of violence that is not charged in the indictment. He cannot be held accountable for use of weapons on the streets of St. Croix or the Virgin Islands in particular. He is only to be held accountable for the charges that are filed in this indictment and which is before you. That's in response to the comment. What are you reading? During rebuttal. I'm reading from the transcript of the jury charge on page one of the second. We didn't have, right? Excuse me? Which we didn't have. It's not in the appendix. Well, the joint appendix, I thought the instructions to the court were in the joint appendix at 193 in particular. But you're saying, you're saying. This is the actual charge. Yeah. And also the court further charged the jury specifically and stated that he wanted to stress, the judge wanted to stress in the strongest terms that regardless of what lawyers say, jury's recollection of facts controls, all of these statements are contained within the transcript of the jury charge. Wait a minute. Were there two charges or one charge? There was a charge the day before the closing arguments. The charge began on April 6th. Yeah. But there was something else. What you've been reading, as you say, was after the closing arguments. Certainly, Your Honor, the transcript of the jury charge on April 7th was after the rebuttal of the prosecutor. Is this in the appendix? Did you say it was? It is not. Oh. Because I just went to look for the appendix and couldn't find it. Can you supply us with a copy of it? Yes, Your Honors. And I would state, Your Honor, that this was ordered by the government after the, we ordered this transcript, which wasn't included in the appendix and received it after the case had been briefed. Yeah. But, you know, we will always take a supplemental appendix, and the government has to know this, we will always take a supplemental appendix if something gets stopped afterwards so that we can have before us everything that's relevant, not only for the government, but for all counsel. What's the effect of the failure to request a curative instruction from the U.S.? Well, it's just one of the factors that the court looks at. There are a number of factors that the court would look at. One would be the statements in the context of the trial. The other would be the evidence of, the strength of the evidence against the defendant, so it's just one factor. But I would submit that the record here is that there was a curative instruction given with respect to that specific statement regarding the failure of the government to produce the weapon, the response to that claim by the defense during closing, and that there were charge to the jury replete with admissions that the evidence was within their purview and that statements and conduct of counsel during argument was not evidence. I agree with that. How about, he actually points out that even though there seemed to be a number of eyewitnesses here and he's alluded to, nevertheless the first jury couldn't reach a verdict. What do you say to that? Your Honor, having not been the trial attorney on this case, I really could not answer to that other than to state that the record before the court is the only record of this case that we have and there are a number of reasons why cases, yeah, you just don't know. Yes, I'm content. Yes, thank you, Your Honors. And if I might just summarize, the government requests that the judgment and sentence be affirmed. Thank you. Good questions. Thank you. Mr. Chancellor. Briefly, Your Honor, just a couple of points. One is regard to the, I guarantee statement, what he didn't say, use a reasonable inference. He says, would this case be different if he said that, if he said to the jury, you can infer that. Instead of the words, I guarantee. Would we have a different case? I think it would soften it a little bit. I'm not sure it would be, how much different it would be, but it certainly would soften it rather than putting his stamp of approval on, on, on, on what he said, that I guarantee it. What I'm really asking is, should we, yes, give a new trial based on, is there a constitutional error based on the U.S. attorney's use of one word rather than other words? Yes. Didn't think you'd say no. It was a rhetorical question. That's plain error. That's plain error. And I do think that it is very similar to the statement in disposal plastics, where the prosecutor says, I guarantee you. The evidence in disposal plastics with regard to those two plea agreements was at trial, as I understand it. That was brought up at trial, that there were two plea agreements. And still, the, Something within the knowledge, something within the knowledge of the prosecutor. Right. And he says, I guarantee you. But there would be no special knowledge here with regard to what that witness saw. The prosecutor wasn't there at that time. He wasn't there, but he thought that, that he gave the impression that he had knowledge, and coupled with the other statements that, well, there was somebody else who said it. Thank you, Your Honor. Thank you very much. We'll take the case under advisement. We're going to ask you both to come up just to help us. Can you cut the mics?